Ms. Ralph Ohm, I am here on behalf of separate appellant Amy Martin who was a Hot Spring County Sheriff Department jailer at the time in question. I'm here on behalf of George Wright who was the jail administrator for the Hot Spring County Detention Facility at the time in question and I'm here on behalf of Hot Spring County in particular the Sheriff's Department. This story basically culminates because I like I'm going to give you the last chapter first and then go back. Yes sir. I have need to clarify is Orrell is still in the case right? Technically he is. Technically I know he's got an administrator but the estate is in the case. It is. It is. The county can't appeal here. The what? The county can't. This is not this is an interlocutory qualified immunity. That is correct. So we don't have jurisdiction over the county's That is correct. Situation. I understand that. I heard that first discussion. You said you were here for the county and I'm. Well, obviously they've been sitting in their official capacity and technically that's I understand this is solely a qualified immunity appeal issue whether or not they are entitled to qualified immunity as provided in their individual capacity for those two. Why do you say the Orrell's in the state is only in the case technically? Well because he is deceased and I mean. No, no I mean the estate. I said the estate. Yes the estate is still a defendant in the case. Okay that's not technically right? That's a that's a damage claim. That is definitely a damage claim. Yes. And that's for the post booking events primarily. Correct. Yes. I don't represent the estate. I understand that. Mr. Orrell. Our story culminates with. Orrell did not. I'm sorry. Orrell did not move for summary judgment. Correct. Does not did not make a qualified immunity claim. That is correct. Okay. Thank you. Why do the captions of the brief show? Barton brought this suit as a plaintiff didn't she? Yes. Well I guess I shouldn't worry about the caption of the brief. Go on please. Well Mr. Barton is deceased as well. Separate defendant Brian Orrell is obviously they're in the case. This is a wrongful death case. But bottom line is our story starts. I want to basically start at the end like I indicated initially. This story starts about nine hours after Mr. Barton was arrested and after he was placed into the High Spring County Detention Center. Upon his arrest there was absolutely no warning signs of any type of impending heart attack. There was no warning signs of any type of heart attack. And that's when you think factually the case started. But but Martin and Wright are primarily denied qualified immunity because they allegedly messed up the booking policies. Right. Correct. And because that wasn't that wasn't nine hours after that was as fast as Trooper Owens got him to the to the jail. No. Well actually though the event that caused this case to even be here occurred nine hours after he was taken to the jail. I understand your view of the facts but but we're talking about qualified immunity. And if you don't focus carefully on Wright's and Martin's role in this then then we're not getting you're not helping us. Well I plan on coming right. That's the next I want. The end of this story is a heart attack nine hours after the arrest and placement in the detention facility. The stories the story starts with Mr. Barton's arrest which would have happened at about 2 3rd actually starts with a single car vehicle accident. And then upon that accident Owens is done. Yes he is. All right. He makes the arrest. We're talking about the booking. Sir. We're basically talking about what did Martin and Wright have to do with any of this before or after the booking. Correct. And I agree with you. Let's talk. When when did when did Castaneda said that Orrell had told him about that that Mr. Barton had a heart condition. That would have been shortly before Mr. Barton was discovered. Well but how did or what's the record show how Orrell knew that. He talked to him and he concluded that he didn't seem to be sobering long long after the booking process. So so what was the what was the disclose. Was there any disclosure of a heart condition in the booking. No. Was there a denial of it or a failure to check. There was a he didn't complete the medical. Miss Martin did not complete the medical questionnaire about the heart condition. Keeping in mind though Mr. Barton didn't know he had a heart condition. In fact he had been to the hospital. Wait wait. Orrell told Castaneda that Barton had said he had just been hospitalized for a heart condition. He told him he had been. He was never diagnosed with a heart issue after being hospitalized about a month before this. So what happens is he shows up in the detention facility admitting to have taken some hydrocodone and chasing that with bourbon. He ends up blowing a point one one on the PBT. That happened at about 30 about the hydrocodone. Yes. She knew about the hydrocodone and she knew about the bourbon. She knew about the point one one at the PBT level. He is brought to the jail at about 315 on the one that afternoon before his heart attack. She places him in a holding cell which would have been next to the the the booking area where she keeps an eye on him and she leaves the facility about 450. So within an hour less than an hour and a half after he comes into the jail Mr. Barton she leaves the building has no more contact with Mr. Barton. George Wright on the other hand never has any contact whatsoever with Mr. Barton never talks to him never discusses anything with him never has any contact with him whatsoever. George Wright is a jail administrator. The problem that what was what was Martin's responsibility upon booking her responsibility was to obviously book inmates in her responsibility was to keep an eye on them and deal with any issues that may arise. Responsibility include any assessment for medical need. It would have. Yes. And what was done. She tried to talk to him and he had slurred speech. He was intoxicated. She believes him to be very intoxicated. So she placed him into the holding cell without going into any detail about their written policies or or unwritten practices to indicate what to do in the case of someone who is recently in an accident and showing signs of intoxication or perhaps having some other physical condition. There are some to check for that. There are some local and the to keep a close eye on this individual possibly consider rejecting this individual and send him to the hospital if in fact he was at a point where she felt like he was a threat to himself or needed medical care. Is there evidence that rejection was considered not really. No. There's evidence that she believes that he had taken the hydrocodone and the alcohol and that that was causing the problems that he was having at the time. There was nothing to indicate that she was aware of any type of a potential heart attack. Nothing to indicate that she was aware of any type of serious medical need or injury at the time. Judge Dawson points out that this was a little bit same would seem to be a little bit more serious than a typical DWI. And if we were talking about a point one one I would have concurred with that. But when you're talking about mixing the hydrocodone with the there's a symptom out there just about that wouldn't couldn't be explained by those two combinations. So this it was a little different than your typical DWI because of the hydrocodone. But there was nothing to indicate again that the decisions to place him into the holding cell would result in a heart attack. How is this different from the Thompson case where you had a booking person denied qualified immunity where you have a similar situation with someone under the influence who later has very serious health concerns. Well it kind of brings me to where I wanted to go to because you know the argument seems to be well the county had certain policies and these officers maybe didn't apply those policies or follow those policies. However Martin with all these officers were certified by the state's home jail standard class. And this court is consistently held as far as a failed to train. If you get that basic training that's provided by the state then that would basically provide a bright line or at least I'm hoping it provides a bright line to as far as a failed to train case is concerned because obviously I deal with these cases a lot. And as you know you always get sued for failed to train and failed to supervise in addition to the act that occurred. I mean that's always the case. And as long as you can demonstrate that they went to the Arkansas Law Enforcement Training Academy or if you can demonstrate that they went through the basic jail standard class usually this court has found that there's not a failed training. Did they do what they should have done on this night in question. Well yes. Did they follow the official policy that requires them to take certain cautionary actions in the face of a highly intoxicated person. They they did what they believe they were supposed to do. Well whether they believed it or not. Did they do what the policy required them to do. Probably not. But isn't that an example of deliberate indifference to a course of conduct that the policy required them to follow. I don't think so. Well you don't think so. But why not. Because they were trained in the real issue how highly they're trained. It's what they did or didn't do. That's important. But the whole case turned on whether or not they were sufficiently trained which brings in George Wright which was the jail administrator who had been a jail administrator for about a month who all of a sudden is now looking at individual capacity liability because this officer did not follow the procedures keeping in mind that it's obvious what they did here was adopted a. It was negligent. You'll concede that it was. I would concede negligence even gross. Was it. Did it go beyond that to the high standard that must be satisfied to maintain a claim like this. I guess that's your argument. That is my argument. I concede the negligence no matter how up we set we are with these people this early. Emotionally speaking it was not that bad. Right. And let me just say this in that vein. Judge woman if he would not have had a heart attack we would not be here. But it's not. I had the case of Grayson versus Ross which everybody talks about. In that case the guy was on methamphetamine and just take a medicine. He died if he had died of DT's if he'd gone in DT's that would've been OK too. I would be writing a check if he if he had died of DT's I would be writing a check because you would have a causal connection between admitting him to the jail not taking care of him properly and or dying of DT's. Here you have him going into the jail maybe maybe not being screened properly and then having a heart attack which he could have probably would have had at home had he been screened properly. What would have might have happened. I think they would have kept him. Pardon. They would have kept him in the jail and kept him in the booking card just as probably if he was screened properly they would have determined that he really wasn't just intoxicated that there was concern for his health beyond the ingestion of certain chemicals and then have a medical professional actually evaluate him and under that kind of care he may have actually been in the hospital when a heart issue arose and may well have been able to have been saved before the heart attack proved fatal. Certainly if those are all possibilities. Absolutely. If you do the but for test you get all the way back to anywhere you want to go and conceivably had that occurred he could have been in the hospital. He could have had the heart attack and he could have still died in the jail because if you know the thing that actually caused his death is a deformed coronary artery or fatty infiltration in the right ventricle in the claim against the right in part due to the lack of his personal knowledge of what was required and his lack of instructing those such as Martin what they should do in circumstances like this. It is keeping in mind he'd only been in the position about a month and also keeping in mind that Martin was trained. If you take the job you got to know what you're supposed to do. I would agree with that. But I mean how long is the jailer supposed to be on the job before he knows what he's supposed to do in the care of inmates. Well he needs to know it pretty quick and there's a requirement that you get certified pretty quick. And my point is all these people were certified by the state and had been sufficiently trained on the denial of medical issue even if they didn't follow the policy. In fact as Judge Hickey pointed out in my next argument with you all she notes that the failure to follow policy does not create a constitutional standard that you look at was there deliberate indifference in this situation and I submit to you that there was not. Thank you very much. Morning Your Honors. My name is Stephanie Lynham and I'm here representing Regina Barton on behalf of the estate of Jeffrey Allen Barton. I'm just going to kind of jump right in on some points that Mr. Ohm was making and some of the things that you guys were asking him about. Something that I think is really important to note is that with regard to the argument that the county could not have predicted the heart attack so they shouldn't be liable for the damages as a result of that. This court in this case actually a prior appeal of this case Barton v. Tabor number 14-3280 stated that the court determines whether an objectively serious need exists based on attendant circumstances irrespective of what the officer believes the cause to be and that's based on Vaughn v. Gray. But this isn't the trooper. The trooper had a lot more exposure than the booking officer. No, this is the booking officer. I think the district court seemed to think that the prior Barton case drove this train and I don't. I don't think this issue would drive the train as to Orell. I think there are three completely different qualified immunity situations and qualified immunity is personal and has to be analyzed that way. Considering severity of symptoms and the context in which those are presented, which is what this court instructed when doing McRaven v. Grayson, it's first worth noting that the jail administrator George Wright had stated that he had never ran into someone in Barton's condition and that he did not think that any of his officers had either. Looking at Amy Barton, the record shows that she noted that Barton appeared highly intoxicated. He had slurred speech, trouble standing alone. She witnessed Officer McRaven's unconstitutional to put him in a jail cell instead of reject him for booking and have him taken to somewhere else, presumably a medical facility. Isn't that the only question here? Well, I mean, I think the question is whether or not he was denied medical care. No, no, but the booking officer is not a doctor. She's not a nurse. She has an information gathering responsibility, which may have been negligently performed, but her decision making, maybe with Wright's supervision, is whether to put him in a jail cell and watch him while he was in a medical facility.  I don't know why people do or whether it's a condition that is so unusual that the facility has to reject him, constitutionally has to reject him. Isn't that what we're talking about? Well, and the facility has a policy that's specifically on point with regard to that question. How many cases have we said that violation of state and local policies do not control federal constitutional issues? Probably more times than I can count. Well, I think it goes to... And that's what the district court basically said. No qualified immunity because you violated your own policies. And that's contrary to our precedence. Well, I think it's, again, a plethora of issues, and I know that Oral isn't here in his individual capacity, but I do think that it reflects on the county anything that Oral did, especially that failure to train Prong. You just said Oral. Did you mean Wright? No, I mean Oral because the county would still be responsible for training him. But Oral's in the case. You've still got your case to try against Oral. Correct, but right now we're talking about the county's failure to train their staff and I think it would be appropriate... But the county's not in this appeal. Okay. I mean, this is Martin and Wright. Whether the policies behind qualified immunity mean that Martin and Wright shouldn't have to incur the expense of defending their own personal liability. That's all we're talking about. So what is the situation confronting Ms. Martin when she's performing her booking responsibilities that constitutionally required her to reject Martin for admission to the jail? Well, I mean, I think when you look at the severity of the circumstances, the fact that Mr. Barton had been in a car wreck, the fact that he had come in, he was acting... Wasn't talking very well. Apparently he fell once, maybe in her... I guess in her presence. Fell in the booking room. Yes, Your Honor. And what's the evidence as to how unusual this was for booking DWI detainees? Well, I mean, had she performed the health care screenings, then she would have seen that he had extensive bruising all over his back and lower body. Wait a minute. She's not personally disrobing him at the booking process. What would she have learned at the screening or what would have happened? Had she screened him appropriately, then she would have seen extensive bruising. She's not a nurse. How would this have happened? It's pursuant to the policies, the detention facility policies, part of their intake of... This is a paper process, isn't it? I wouldn't think so. I don't know. It's an extensive intake. She doesn't take him in a car. How does it work? Well, it didn't because she didn't do it at all. She said that she would have if it were a female, but that since it were a male, she did not. She openly admits she did not survey his person or his body at all. This is a gentleman who had just been in a car wreck. How would seeing bruises have affected the booking process? Drunks in car wrecks are apt to be bruised or worse. There are some photographs in the record. These are extensive bruises from shoulder to back. Extensive bruises. And the bruises happen to be the record reflects from... A constitutionally appropriate booking officer would have said this person has to go to a hospital because of the bruises? I have an expert that says that the consumption of the alcohol and an unknown amount of hydrocodone, so you have that alcohol and pharmacology mixture and declining circumstances. When he came into the detention facility, Mr. Barton somewhat walked in. And yet when he came out at the blood alcohol content room with Officer Owens, he could barely stand up straight. He couldn't walk to his cell. There was a decline. Was there complaints of chest pains or did there... Nothing in the record reflects that. Nothing in the booking chart reflects that. Getting back to Judge... I think it was Judge Logan's question. Was the situation such that would have required Martin to reject him as a jail admittee? In other words, had his intoxication proceeded to the point that a reasonable person would have known that he was in great danger of maybe self-asphyxiating on his own vomit or something like that? I think that a jury could conclude even from what jail administrator Wright said that he had never seen anybody in this condition and he's pretty sure that his staff hasn't. When did he see him? I'm assuming that he is basing this on the video footage that he saw and his discussions with his inmates. This is not contemporaneous? No. So you have nothing contemporaneous as to Wright? No. Is this a supervisor liability as to him, personal? He's responsible for training and supervising. What's your best case for personal liability of a failure to train supervisor? I think that when you're looking at the number of policies that Amy Martin failed to follow. You've got the county in the case. You've got Wright in his official capacity to the extent he's the decision maker in the case. I ask, what's your best authority for denying Wright qualified immunity as to his individual liability because he had nothing to do with the incident other than his training may have contributed to what his subordinates failed to do? Personal liability for a supervisor responsible for training and supervision? I don't know. I can't think of any. When I asked him in his deposition about the policies, about the mandates that he has to instruct his employees or his staff to follow. He said that he knew that he was the one they were supposed to come to for guidance and for supervision and for advice and that it's possible that medical clearance was required, but he wasn't sure. How is what you're describing anything more than negligence? I think when you're responsible for these detention facility staff and the inmates in there and they aren't properly trained by the policies and you don't yourself know what the policies even mean to tell them what they mean. I think that rises above just negligence. I'm back to what you're saying is that everything bad that happened under rights authority he's personally liable for because he was so inattentive to the need to train and supervise. I'm saying give me a case, not even a circuit case, give me any circuit case for personal liability before being for failing to enforce policies to train and supervise. That's my problem with the district court's decision. The district court, I don't think he ever even thought of that. I'm not sure. You can't give me a case. I'm not sure. You've looked at it the way that I'm seeing the issue. As to right, qualified immunity for personal liability. A very narrow part of the case, but an important part. I can't give one to you at this time. Back to Martin then, because I think Martin is, obviously she was personally involved in the booking process. If there was deliberate indifference, that's attributable to her. Right, your honor. There are a number of things. Martin, she failed to complete the majority of the paperwork that she was supposed to with regard to his booking process. She failed to perform the mandatory health care screenings. She failed to reject him as a detainee, which was mandated by the detention facility policies. She failed to appropriately classify him as a special detainee, which would have actually made his, he would have been checked every 15 minutes as opposed to once an hour, which would have made, could have made a very big difference. Counselor, your time has expired. Thank you. Mr. Holm, I believe you've got a minute. Your honor, you're absolutely right. The failure to follow jail policy does not stay the claim of constitutional dimensions. You have said that multiple, multiple times. You've already picked up on this. For a claim of deliberate indifference, the prisoner must show more than negligence, more than even gross negligence. The mere disagreement with the treatment decision does not give rise to a level of constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. In this case here, the thing that made me appeal this was the George Wright decision. I was surprised at that decision. The situation you have here is if this court affirms Judge Dawson, then any supervisor is going to be personally liable for any officer who doesn't understand the local policies that are not even constitutionally valid if that happens. So what I want to try to do is prevent that from occurring. I don't think that is the law. I don't think that was ever intended to be the law. You guys, your honors have been very consistent. You need to have personal participation. Even if he would have found Amy Martin a fact question, I probably would not have appealed that, to be honest, because I can see where you can kind of say, well, maybe, maybe not. But in her situation, even, if you reach Judge Dawson's opinion, he talks about the jail's personal policies probably 15 times. Never once, I mean, he mentions the law on deliberate indifference, which is really the standard would a regional person have known. And he mentions that as this is the law. And then he jumps into the policy, and he goes crazy on the policy. I'm asking you to just let us know if we train somebody, if we send somebody to the Arkansas Law Enforcement Training Academies, have they been sufficiently trained? If we send somebody to the state jail, minimum standard policies, have they been trained? Frankly... Now you're arguing the county issue. I know, but I'm just... You get to defend the county when... When we come back. When and if the O.R.L. situation goes to trial, because that's going to be, if Castaneda is believed, the hours between booking and death are quite... They are. Quite a serious constitutional question. They do. And frankly, her own expert says that really nothing was unusual until about 8 o'clock. By 8 o'clock, they should have started seeing some improvements. But... And that's for the trial level down there. But the bottom line is High Spring County would have been better off to not even adopt any jail policies under this scenario, rather than go out here and get some model policies from Criminal Justice Institute or some large county, which is what I'm sure they did, that has a 10-page rejection policy. I mean, you know... Thank you, Mr. Allen. Thank you very much. Alright. I'll see you again in about 30 minutes. Thank you.